# EXHIBIT 1

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  Jerome W. Carter
     12807 Redgrave
     Upper Marlboro, MD 20774

From:  **Washington Field Office**
       1801 L Street, N.W.
       Suite 100
       Washington, DC 20507

| | |
|---|---|
| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 100-2005-01066 | **Janet Stump,** Acting Enforcement Supervisor | **(202) 419-0700** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana Hutter* (signature)

**MAY 2 7 2005**

Enclosure(s)

**Dana Hutter,**
**Director**

*(Date Mailed)*

cc:  Carl Williams
     Director of Personnel
     **THE WASHINGTON POST**
     1150 15th Street, N.W.
     Washington, DC 20071

# EXHIBIT 2

COMMONWEALTH OF VIRGINIA
VIRGINIA EMPLOYMENT COMMISSION

## DECISION OF APPEALS EXAMINER



Local Office   : INTERSTATE UNIT

Claimant's SSN : 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

Date of Hearing: 04/11/2005

Decision No.   : UI-0504206

Decision Mailed: 04/15/2005

CLAIMANT:
JEROME W CARTER
12807 REDGRAVE DRIVE
UPPER MARLBORO   MD 20774

Date Referred
or Appealed : 03/02/05

Date Deputy's
Determination: 02/18/05

JEROME W CARTER
12807 REDGRAVE DRIVE
UPPER MARLBORO   MD 20774

LIABLE EMPLOYER:
THE WASHINGTON POST CO
P.O. BOX 283
ST. LOUIS        MO 63166-0283

IN THE MATTER OF:      JEROME W CARTER
                              VS
                  THE WASHINGTON POST CO

NOTICE: THIS DECISION BECOMES FINAL 30 DAYS AFTER MAILING UNLESS AN APPEAL IS FILED. THE
APPEAL MUST BE IN WRITING AND SHOULD STATE THE REASON FOR THE APPEAL. THE APPEAL SHALL BE
FILED (1) IN PERSON AT THE LOCAL OFFICE WHERE THE CLAIM WAS FILED, OR AT ANY OTHER V.E.C.
OFFICE, (2) BY MAIL TO THE V.E.C., COMMISSION APPEALS - ROOM 126, P.O. BOX 1358,
RICHMOND, VA 23218-1358, OR (3) BY FACSIMILE TRANSMISSION TO COMMISSION APPEALS AT
(804) 786-9034, NOT LATER THAN MIDNIGHT OF MAY 15, 2005.

**APPEARANCES:**  (In Person) Claimant; Employer Representative; Agent For Employer

**STATUTORY PROVISION(S) AND POINT(S) AT ISSUE:**  Code of Virginia, Section
60.2-618(2) - Was the claimant discharged for misconduct connected with work?

**FINDINGS OF FACT:**  This case is before the Appeals Examiner pursuant to a
timely appeal filed by the claimant from a Deputy's determination finding him
disqualified, effective January 23, 2005.

The claimant's liable employer is the Washington Post Company, where he worked
as a general worker from June 1989 to January 26, 2005. The claimant worked
full-time.

The employer offers an EAP Program to its employees which is confidential.
There is no provision for mandatory EAP referral.

In September 2004, the claimant was warned because of attendance problems. On
October 15, 2004, the claimant left work an hour early without permission from
his supervisor. As a result, he was suspension for five days.

DECISION NO.   UI-0504205        PAGE   3

The Commission went on to disqualify the claimant from the receipt of unemployment benefits for misconduct based upon evidence that he directed profanity at the vice president in a loud voice and called him a liar in the presence of other employees.

In this case, the claimant was discharged on January 26, 2005, the day after a telephone conversation between the claimant and the pressroom superintendent. The claimant offered no reasonable explanation why he told the Deputy that the doctor told him he did not have to attend anger management classes when the doctor specified in his November 10, letter, that the claimant's attendance and anger management classes should be mandatory.   Notwithstanding these concerns about the reliability about the claimant's testimony, the Appeals Examiner finds that the claimant is entitled to receive UI benefits.

The claimant supplied the employer with medical documentation evidencing that he was unable to work from November 2004 through February 22, 2005.   The press room superintendent stated that she telephoned the claimant on January 25, to discuss, among other things, the claimant getting suitable releases to the employer.   The press room superintendent stated that during the conversation, the claimant became argumentative and rude and hung up on her.   Although, she also stated he did not direct any profanity to her.   The claimant denied being rude and also stated that he did not hang up the employer, but was on a cordless phone and the phone would not recharge sufficiently to keep the conversation going.   Based on these conflicting accounts, these conflicting accounts of the January 25, telephone call, the Appeals Examiner find that the recollection of both parties is equally reliable.   Therefore, the Appeals Examiner finds that the employer did not meet its burden of showing that the claimant was discharged for insubordination.

DECISION:   The determination of the Deputy is hereby reversed. ✗

The claimant is qualified to receive benefits, effective January 23, 2005, with respect to his separation from the services of The Washington Post Company.

The Deputy is instructed to carefully examine the claimant's eligibility for any week or weeks benefits are claimed and to render whatever appropriate determination is deemed necessary.

W. L. Chambers
Appeals Examiner

WLC/dw

cc:  The Washington Post Company
     Wimsatt Road
     Springfield, Virginia   22602

# EXHIBIT 3

**Jim Coley, Springfield Plant Manager**
To:     The Washington Post

From:   Jerome W. Carter

Date:   March 28, 2001

Subject: Meeting of March 27, 2001

On March 27, 2001, I met with Lawanda Turner, Bernie Mornot, Jane Doll, I am submitting this memorandum in regard to several issues that were discussed and because I feel that I should document what I perceive to be total disregard and negative feedback from this meeting. The meeting was two part, Ms. Turner's issues and the other part an unresolved incident between Mr. Mornot and I that has gone unaddressed from my prespective, since I was never responded to by Ms. Doll. I will address Ms. Turner issues first.

The issues for Ms. Turner was my work performance.  She addressed that I was away from my work area on several instances on smoke or bathroom breaks.  My response and her acknowledgment was that I had informed Ms. Turner but I did not wait the 15-20 minutes for her to come to check my work before I left to take these breaks. Ms. Turner also took exception to one time in which she wanted to leave early and my work assignment was not complete and I responded that I had two more hours left to work, she wanted me to rush so she could leave early.  I find these issues to be a smoke screen since they do not speak to my actual work performance and only to breaks which my work at the moment was acceptable for me to take a break. I take exception to Ms. Turner's accusations since I know that my work performance has never been an issue with Ms. Turner.  In fact, Ms. Turner and Mr. Mornot can acknowlege that I have gone to great lengths to assist, teach and perform emergency situations that have occurred that Ms. Turner the person in charge was not prepared to handle and direct workers.  My perception of all the issues Ms. Turner now has with me are due in large to my speaking out about her inadequacies in a general workers staff meeting.  Since the staff meeting, Ms. Turner has been quite abrupt, rude and restrictive to me where prior to the staff meeting she was not and she has been directed by Mr. Mornot to do this only on the night shift, the break issues are not required of any other shifts.

The other part of the meeting in which Ms. Turner was not present dealt with an incident that was inflicted on my person and occurred on my return from compassion leave. This is an incident that they feel is resolved and I do not. I went to Ms. Doll some time ago and addressed a situation to her that left me humiliated, verbally abused and physically touched, in which I informed her had

I responded in kind I would not be employed at the Post.  In this meeting Mr. Mornot admitted to Ms. Doll that he in fact did the things I had mentioned and verbally apologized.  I responded that the only acceptable apology to me was a written apology placed in my file as long as I am employed at The Washington Post.  I wanted his superior made aware of the incident and acknowledge that the Washington Post does not condone his behavior.  Ms. Doll disregarded my request and implied I was bitter and this the end of it.  I continue to differ since she did not experience what I did and because I do not think Mr. Mornot is not accountable as any Post employee who was physically abusive would be.  I also feel I am not being taken seriously.

Let me also inform the Post that there was a meeting on the Friday before where these issues were touched on and it was evident that it was not resolved since I would not elaborate on the personal issue in that setting with other co-workers.

In closing, I feel had I not spoken out in the staff meeting about staff issues I thougt were important to me I do not think Ms. Turner or Mr. Mornot would be treating me in this manner I feel to be harassing.  I feel I am being portrayed incorrectly and feel the actions taken are meant to silence and intimidate.

I would like this memo placed in my personal employee file and would like to be copied on any responses to this memo.


Jerome Carter
General Worker, Springfield Plant



cc:  Bernie Mornot
     Lawanda Turner
     Joel Bearfoot (? last name?)
     Jane Doll
     Patricia Dunn

# The Washington Post

1150 15TH STREET, N.W.

WASHINGTON, D.C. 20071

(202) 334-6000

WRITER'S DIRECT TELEPHONE NUMBER

SPRINGFIELD PLANT
7771 WIMSATT ROAD
SPRINGFIELD, VIRGINIA 22151

June 7, 2001

**By Certified Mail**

Mr. Jerome Carter
General Worker #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
12807 Redgrave Drive
Upper Marlboro, MD 20772

Dear Mr. Carter:

The purpose of this letter is to document your three (3) day suspension for both insubordination and for leaving work without permission. The days of your suspension were June 1, June 2 and June 5, 2001.

The triggering events happened on Thursday night, May 31, 2001. You were in a meeting with The Post's Human Resources Director Martha Lequeux and me to discuss the results of The Post's investigation into the allegations in your letter of March 28, 2001. During this discussion, you became agitated over what you perceived as an unsatisfactory response. At one point during the meeting, you stood up and said that you did not have to sit in there and listen to what we were saying. Even after telling you several times not to leave, so that we could finish our discussion, you walked out of my office and into the pressroom. I followed you into the pressroom and told you that if you refused to sit down and talk to us, I would have no choice but to send you home. I went out of my way to walk beside you and tell you several times, "Jerome, you don't want to do this." I was finally able to convince you to turn around and return to my office where we finished the discussion.

Shortly after our discussion, you returned to my office. You asked if you could leave because you were too upset from our meeting and couldn't keep your mind on your work. I told you that I couldn't let you go because it was late in the night and I wouldn't be able to replace you. In the exchange, you told me that I had no right to keep you there if you wanted to leave. I explained to you that, as your manager, I was instructing you to stay and that you had no right to walk off the job.

About five minutes later, Ms. Lequeux and I were walking through the pressroom toward the pressroom office. You stopped me and told me that you were leaving. You said, "I'm off the clock. You have no right to keep me here." You then turned around and walked through the double doors, leading towards security. I followed you out of the pressroom, through the double doors to the main hallway by Security. I told you that if you left, you would not be allowed to return to work until you had a meeting with me. You would not turn around or acknowledge my warning. You insubordinately continued to walk down the hallway, past the cafeteria, towards the locker rooms. I told security to make sure you left the building.

On Friday, June 1, 2001, we held a meeting with you to discuss the incident. Present at the meeting with you and I were Pressroom Assistant Superintendent Joel Barefoot, Pressroom Support Services Manager Bernie Mornot and your union representative, Harkless McLemore. In the meeting, you denied that you had walked off your job, even though your insubordinate words and actions were witnessed by both me and Ms. Lequeux. You then claimed that the security guard had come into the pressroom, stopped you from doing your work, and forced you to leave the building. You claimed that you had no intention of walking off your job even though you insubordinately told me – as you were walking out of the pressroom and toward the locker rooms without my permission – that you were "off the clock" and that I could not require you to stay.

Mr. Jerome Carter
June 7, 2001
Page 2

Your claims that you did not walk off the job and that you intended to stay at work are not credible. Your insubordinate behavior was witnessed by me and Ms. Lequeux, and your current version of the events and your intentions is simply not truthful. It is a fact that you insubordinately told me that you are "off the clock" and that I could not, as your manager, require you stay. It is a fact that you insubordinately refused to turn around and talk to me while I was addressing you as you walked out of the pressroom. And it is a fact that you walked out of the pressroom without my permission or the permission of any other supervisor. In addition, your statement that Security stopped you from working in the Pressroom is also untruthful. In fact, you were not working in the Pressroom when Security found you; you were in the hallway near the General Worker's office – and certainly not working.

Jerome, the type of behavior that you displayed on May 31 will not be tolerated. You can not just walk out of a meeting with a supervisor whenever you disagree with what is being said. You can not turn your back and walk away from a supervisor when the supervisor is addressing you about your job. And you have no right to leave work without the permission of your supervisor. This applies to all of your supervisors, including Bernie Mornot and Lawanda Turner.

This is not the first time that you have engaged in such improper behavior or otherwise violated our work rules. In May 1991, you were given a written warning for unacceptable behavior in the face of a legitimate directive from a supervisor. In that instance, you became belligerent, abusive and profane with your supervisor after he observed you leaving work early without permission and directed you to return to work for the remainder of your shift. You were warned that further instances of such behavior would subject you to increased disciplinary action, up to and including termination. In August 1997, you were issued a written warning about your unacceptable pattern of attendance.

Let me emphasize again our expectations: you must report to your supervisor at the beginning of every shift, on time and ready to work; you must follow the instructions of your supervisors and perform all work assignments given to you: you must notify your supervisor before you leave your assigned work area before your breaks and at the end of your shift; and you must not to leave your assigned work area without the permission of your supervisor. In addition, you must refrain from insubordinate reactions to the directives of your managers and supervisors. You are hereby warned that, if you engage in any other instance of insubordination or other unacceptable workplace behavior, you will be subject to increased disciplinary action and, in all likelihood, discharge from employment at The Post.

Sincerely,

*Eric Brinkmann* *my*

Eric Brinkmann
Pressroom Superintendent

EB:may
Cc:     Jim Coley
        Jan Doll
        Martha Lequeux
        Bernie Mornot
        LaWanda Turner
        Kevin O'Neill
        Greg Estep
        Rod Griggs
        Patricia Dunn
        Allen Hounshell
        Personnel Records
        Graphic Communications Union #449

**The Washington Post**

March 26, 2002

Patricia Dunn
The Washington Post
1150 15th Street NW
Washington, DC

Dear Ms. Dunn,

After careful consideration, I am responding to the letter of June 7, 2001 from Mr. Brinkman, the Springfield Plant Pressroom Superintendent. I have found that I must respond because of continued harassment and being singled out as a problem employee. The fact that this letter was submitted to deny me Workmen's Compensation when I was in fact injured on the job which happen to be a re-injury of a work related injury I have had in the past. The Post nurse and the hospital I was sent to that night examined me and both agreed I was injured. The action of Mr. Brinkman to interject his suspicions is quite biased and unimaginable to me which forces me to realize that I had to respond to his letter which is full of inaccuracies. My suspension and injury were two separate incidents having nothing to do with each other.

The incident of May 31st spoken about in the June 7th letter is completely inaccurate, slanderous and a misrepresentation of the truth. The sole reason why I was suspended was I refused to be a part of another meeting without Union representation or Union involvement. I had stated to Mr. Brinkman in advance after several impromptu meetings he initiated, the last being May 16, that I did not want to be a part of these one-sided meetings with him and other Post management employees chastising me without having my Union Rep present.

The whole problem that led to the May 31st incident and my suspension actually had to do with a complaint that happened in October 2000. My complaint was against Mr. Mornot which Mr. Brinkman and others wanted to cover up and excuse. Back in October 2000, Mr. Mornot was intoxicated and verbally and physically abusive to me upon my return from compassion leave. Mr. Mornot had denied me the length of time off for death in the family so I checked with the payroll department, which said there was no reason to deny the three days compassion leave for bereavement and I relayed to Mr. Mornot. Upon my return to work I was cursed, shoved and pushed and threaten with the loss of my job by Mr. Mornot who was intoxicated at the time who keep yelling about my going over his head and that he was in charge of the department and would run it his way (please note that Mr. Mornot was new to this position). Had I fought back I know only I would have lost my job, which hurt especially because I had suffered a family loss and was still grieving. When I complained and it was learned that this situation did occur, Mr. Mornot verbally apologized to me. Because Mr. Mornot was new to the job, management made the decision that it should be passed over. But would that behavior be tolerated for a nonmanagement employee? Mr. Brinkman and others in management told me Mr. Mornot's apology was good enough, however it was not for me. None experienced my humiliation. I wanted a written apology placed in my employment file since Mr. Mornot had threaten my job and humiliated me. I was humiliated, talked about and laughed at by coworkers regarding this incident for several months. Mr. Mornot I felt used me as an example to make himself look in control and exert a subtle form of power in his department.

The actual reason for my suspension was I did not want to participate in anymore impromptu meeting (about nine meetings w/others) without Union representative regarding the Mornot complaint. On May 31 during the meeting for which I was suspended, I wanted to return to work but I was threaten that I better sit there or I had to leave the building. I refused to remain without my union representative and was escorted out of the building by security at the request of Mr. Brinkman. I was never belligerent but rather calm just adamant about my decision to be represented and asked several times to go back to work. I never walked out the Post I was instructed to leave, just as Mr. Brinkman states in his own letter of June 7th that "I followed you into the pressroom and told you that if you refused to sit down and talk to us, I would have no choice but to send you home". I wanted to go back to my work assignment but was told to leave. **It is quite unjust that the only time I had union representation was when Mr. Brinkman suspended me.** After that I received this June 7th letter which is basically setting me up to have a valid reason to fire me. I believe this to be true since Mr. Brinkman references a May 1991 incident that was investigated by Mr. MacPherson, a former superintendent, and Mr. Hounshell. My letter from Mr. Hounshell states regarding the May 1991 incident that "neither he (MacPherson) or I have been able to verify this". Mr. Brinkman also says that I was warned in August of 1997 about my pattern of attendance. I was never given a written warning or disciplined regarding my attendance nor is my attendance any worse than many co-workers in the General Workers Department. However, why is it that Mr. Brinkman did not speak of the 1999 incident in which I complained about being threaten by a co-worker as a supervisor and that incident was also disregarded. I was not protected as my current supervisors and would not have ever thought to physically touch that employee as Mr. Mornot did to me.. All of Mr. Brinkman's accusations are untruths, Mr. Brinkman has never worked with me and does not know me to discredit, slander and labeled me as a bad employee. He is merely going by what had been told to him revolving around Mr. Mornot, he has not taken my accounts seriously. I refused to be cursed and physically mistreated by someone because he has a title. I deserved to be treated with respect also and will speak up when persons want to label me incorrectly.

Since 1991, I have been a topnotch employee and was even night supervisor for two years during the time the new presses were installed and **worked very hard and diligently for the Post.** I have done nothing different than other employees to be constantly followed watched and restricted except complaining about Mr. Mornot and voicing my opinion about general work duties in instances of an open forum where employees were asked to voice their opinions. I have found that you have to go along to get along. It appears after going to my compensation hearing that Mr. Brinkman wants to continue a pattern of intimidation against me and discredit me. My injury was documented that night by the onsight nurse and the hospital. I was sent to Post doctors that also stated that I did in fact suffer an injury. It is absolutely outrageous that I was unable to receive medical attention or compensation during that period of time. I decided then that I would just take what was happening to me so I could come back to work and just do my job hoping that things would get better. I now know Mr. Brinkman and others do not want to allow me to just come to work and do my job like other employees but continue to find fault so I have to choice but to document my side of things.

My work situation has been mentally distressing. I have been afraid and mentally distressed since my suspension because Mr. Brinkman constantly watches me. I have been singled-out and I am treated differently from coworkers because I have spoken up -- it feels like I have been blackballed because no one will deal directly with me everything that involves me must be reported to Mr. Brinkman for an answer.

To conclude, I think the Springfield plant management has violated my rights as an employee, caused me mental harm and provided me a very uncomfortable work situation that is becoming unbearable. I still do not accept Mr. Mornot's apology without written acknowledgement and feel that Mr. Mornot has been given a pass which is a bad reflection on the Washington Post since their policy is suppose to not tolerate that kind of behavior from employees or supervisors without distinction -- except in my case. I have tried to put this behind me and come to work and do my job but I have been continually humiliated and constantly followed which is creating a very uncomfortable work environment for me.

In closing, I would like this letter placed in my employee file. I would also like to speak with you or the appropriate person with a Union representative to put an end to this unresolved situation where I do not feel threaten with the loss of my job and get back to a normal working environment for myself.

Sincerely yours,

Jerome W. Carter
Pressroom General Worker


Cc:    Eric Brinkman
       Jim Coley
       Martha Lequeux
       Bernie Mornot
       Kevin O'Neill
       Greg Estep
       Rod Griggs
       Allen Hounshell
       Personnel Records
       Graphic Communications Union #449

# EXHIBIT 4

```
*******************************
***   ERROR TX REPORT   ***
*******************************
```

TX FUNCTION WAS NOT COMPLETED

```
TX/RX NO              0605               9
CONNECTION TEL
SUBADDRESS
CONNECTION ID
ST. TIME              04/28 09:40
USAGE T               00'00
PGS.                  0
RESULT                NG
                      0        STOP
```

## MEDICAL CERTIFICATION FOR LEAVE TIME/ RESTRICTED DUTY

✓ Accident & Sickness ___ FMLA

### EMPLOYEE INFORMATION (to be completed by employee)

Name _Jerone Carter_ Soc. Sec. _126. So. 5537_ Date of Birth _2.15.57_

Address _12807  Redgrave DR, UPPER Marlboro  MD._
_20774_ (SF)

Phone _(301) 249-6185_ Dept./Plant _General Worker_ Job Title _Pressroom, C/W_

Name of patient (if different from employee) _Jerone Carter_ Relationship _—_

Type of condition or injury _Neck / Shoulder_ Date of onset: day _3_ month _07_ year _01_
   *If an injury caused by an accident, please give details of accident: _____

Is the injury or condition work-related? ✓ Yes ___ No

I authorize the undersigned physician to release all information pertaining to this claim. A photocopy of
this form is is as valid as the original. _2.18.03_

_____   Date
Employee Signature

### PHYSICIAN INFORMATION (to be completed by the physican)

A. DIAGNOSIS  _Chronic Neck + Shoulder pain_

1. Diagnosis of medical condition: _pain - Neck, shoulder_

2. Basis for diagnosis (i.e. patient symptoms, X-Rays, MRI, etc.): _arthritis - chronic_

3. Is the condition work-related? ✓ Yes ___ No

B. TREATMENT

1. Description of surgical/nonsurgical procedures: _None at this time_

2. Duration and frequency of treatment: _____

Tracking # KP  962323



**KAISER PERMANENTE.**

CARTER, JERONE
SSID - 381 - 51
02/15/1957

Patient Identification

## OPL REFERRAL FORM /
## VERIFICATION OF TREATMENT

**IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED,
OR THE RESULT OF AN ACCIDENT?**           ☑Yes ☐ No   Injury date _6/01_

The above named patient has: (circle all appropriate)

    1. received medical treatment                 treatment date(s) _9/17/03_

    2. received medical advice                        advice date(s) _____

Physical Findings/Diagnosis _____ _Neck / arm / back pain_

Disability/Illness _____ Disability/Illness date from _____ to _____

The patient:

☐ Has been ill and unable to work from _____ to _____.

☐ May resume regular work on _____

☑ May resume restricted work as follows _No exessive push/pulling, reaching,
climbing or lifting > 10 lb_

    from (date) _____ until approximately _____

☐ Will need a follow-up appointment on or about _____

☐ Is able to participate in competitive sports.

☐ May return to school on _____

☐ Should be excused from Physical Education until _____

☐ ʳ... ... _____ medication and should receive _____ dose(s).

☐ Advice protocol _____ ... days. Possible reaction _____

_Sheth_                                    _8043_          _9/17/03_
Signature and printed name                 Provider #      Date

I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND
I AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT
MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.

X _____

Signature (patient)                                        Date
00223144 (05/01)

**MEMBER**

_Upper Marlboro, MD_

Phone (301) 248-3188  Dept./Plant _SF, GW_  Job Title _Pressroom Gen._

Name of patient (if different from employee) _Same_  Relationship _____

Type of condition or injury _Neck, Shoulder_  Date of onset: day _04_ month _1_ year _04_

   *If an injury caused by an accident, please give details of accident: _____

Is the injury or condition work-related? ✔ Yes  ___ No

*I authorize the undersigned physician to release all information pertaining to this claim. A photo copy of this form is as valid as the original.*

Employee Signature _____  Date _11.12.04_

---

## PHYSICIAN INFORMATION (to be completed by the physician)

### A. DIAGNOSIS

1. Diagnosis of medical condition: _R shoulder disease, cervical radiculopathy, left shoulder strain with chronic neck and shoulder pain_

2. Basis for diagnosis (i.e. patient symptoms, X-Rays, MRI, etc.): _history, By_

3. Is the condition work-related? ✔ Yes  ___ No

### B. TREATMENT

_conservative_

1. Description of surgical/nonsurgical procedures: _NA_

2. Duration and frequency of treatment: _NA_

3. Date of: first visit _11/12/04_ last visit _11/22/04_ next visit _____

4. Hospitalization (if any): place _NA_  dates __/__/__ to __/__/__

5. Referral(s) (please list if referred for tests, therapy or for additional medical opinions): _____

### C. ABILITY TO WORK (answer only if patient is a Washington Post employee)

1. When will patient be able return to work full duty? _yes_ Restricted duty, if available? _N/A_

2. If recommending restricted duty, explain nature and duration of limitation: _NA_

3. Patient was or will be <u>totally unable to work</u> from _NA_ 20___ to _____ 20___

4. This assessment is based on ___ a written job description, ___ patient's verbal job description, or ___ verbal job description by _____ (name of employer representative).

_Dr. Shailesh..._  _____  _11/23/004_

Type or print Physician's Name  Physician Signature

 **KAISER PERMANENTE**®

Mid-Atlantic Permanente Medical Group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

Name _Jerome Celester_ Med.Record # _55 1 038151_ Provider _Dr Sheth_

This letter is to inform you of results from your recent diagnostic studies.

[  ]  Sonogram is negative  (normal)

[  ]  Cultures for Chlamydia and Gonorrhea are negative (normal)

[  ]  Urinalysis is normal

[  ]  Complete blood count is normal

[  ]  Syphilis (RPR) is negative (normal)

[  ]  Blood Sugar (Glucose) is within normal --- Glucose reading is _____

[  ]  Thyroid test(s)  are normal

[  ]  Coronary Risk Profile  is acceptable
        Total Cholesterol _____
        HDL (good cholesterol) _____
        Triglycerides _____
        LDL (bad cholesterol) _____

        Recheck your cholesterol levels again in  _____ 6 Mos.  _____ 1Yr.

[  ]  X-Ray of _____ is normal

[ ✓ ]  Other Tests   _MRI of Neck Shows as before Some_
_disc abnamalities but No nerve damage._

Comments :   _Physical Therapy referral enclosed  if_
_interested_

If you have any questions regarding these results, please contact the Advice Nurse at  703-359-7878.

Thank-You . The Internal Medicine Department

Medical Center Largo
1221 Mercantile Lane
Upper Marlboro, Maryland  20774-5374
301.618.5500

# EXHIBIT 5



# RIVERSIDE
## REGIONAL MEDICAL CENTER

November 18, 2004

TO WHOM IT MAY CONCERN:

Jerome W. Carter has been visiting his mother, a patient in Riverside Regional Medical Center. He has been here from November 16th – 18th taking care of family business.

Sincerely,

Pat Hoadley
Risk Management

500 J CLYDE MORRIS BLVD
NEWPORT NEWS VA 23601-1976
(757) 594-2000
http://www.riversideonline.com/

# EXHIBIT 6

# MEDICAL CERTIFICATION FOR LEAVE TIME/ RESTRICTED DUTY
___ Accident & Sickness ___ FMLA

**EMPLOYEE INFORMATION** (to be completed by employee)

Name _Jerome Carter_ Soc. Sec. _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_ Date of Birth _2.15.57_
Address _12807 Rosecroft DR_
_UPPER MARLBORO, MD 20774_
Phone _(301) 219.5185_ Dept./Plant _Spriosd_ Job Title _Press 300 Col W1_
Name of patient (if different from employee) _Jerome Carter_ Relationship _~_

Type of condition or injury _Uncle Should_ Date of onset: day _6_ month _7_ year _2001_
*If an injury caused by an accident, please give details of accident: ___

Is the injury or condition work-related? _✓ Yes_ ___ No

I authorize the undersigned physician to release all information pertaining to this claim. A photo copy of this form is as valid as the original.

Employee Signature ___ Date _11. 25. 04_

**PHYSICIAN INFORMATION** (to be completed by the physician)

### A. DIAGNOSIS

1. Diagnosis of medical condition: _(R) shoulder strain with chronic Shoulder Pain_

2. Basis for diagnosis (i.e. patient symptoms, X-Rays, MRI, etc.): _By History_

3. Is the condition work-related? _✓ Yes_ ___ No

### B. TREATMENT _Medications_

1. Description of surgical/nonsurgical procedures: ___

2. Duration and frequency of treatment: ___

3. Date of: first visit _11/22_ last visit _12/23/04_ next visit _1/20/05_

4. Hospitalization (if any): place ___ dates _/ /_ to _/ /_

5. Referral(s) (please list if referred for tests, therapy or for additional medical opinions): ___

### C. ABILITY TO WORK (answer only if patient is a Washington Post employee)

1. When will patient be able return to work full duty? Restricted duty, if available? _1/22/05_

2. If recommending restricted duty, explain nature and duration of limitation: ___

3. Patient was or will be totally unable to work from _11/20_ 20 _04_ to _1/22_ 20 _05_

4. This assessment is based on _✓_ a written job description, ___ patient's verbal job description, or ___ verbal job description by ___ (name of employer representative).

_Maurice Catas_ _(Maurice Catas MD)_ _1/10-05_
Type or Print Physician Name   Physician Signature   Date
Address of Physician   Telephone Number _301-618-5500_

_Received 1-10-05_

KAISER PERMANENTE LARGO
MEDICAL CENTER
1221 Mercantile Lane
Largo, Maryland 20774

**WASHINGTON POST INFORMATION** (to be completed by nurse/benefits administrator)
Is employee able to return to work with stated restriction? ___ Yes ___ No
Approved by ___ (name of department representative)
Comments: ___

Nurse/Benefits Administrator Signature ___ Date ___
Rev 3/97

# EXHIBIT 7

SENT BY FAX

TO:       Ann Griffin
          Health Center, Washington Post, Springfield Plant

FROM:     Jerome Carter

SUBJECT:  Dr. Restak's  Medical Evaluation Concerning Jerome Carter

DATE:     December 9, 2004


On Nov. 18. 2004, in a meeting with Jan Doe; Melinda Ford, Ms. Jennings and Jerome Carter; I
requested a copy of Dr. Restak's. EVALUATION REPORT OF ME.   I was denied a copy and
not allowed to even view the doctor's report. I am therefore making a formal written  request to
receive a copy of Dr. Restak's report. If you are unable to provide me with a copy of his report I
would like a written explanation for why you can give me a copy.   Ms. Griffin, since I have not
received a copy of the doctor report I should still be on MEDICAL EVALUATION LEAVE.

# EXHIBIT 8

# The Washington Post

1150 15TH STREET, N.W.

WASHINGTON, D.C. 20071

(202) 334-6000

SPRINGFIELD PLANT
7171 WALKER ROAD
SPRINGFIELD, VA 22151

WRITER'S DIRECT TELEPHONE NUMBER

_____

December 22, 2004

## BY REGULAR AND CERTIFIED MAIL

Mr. Jerome Carter
General Worker
12807 Redgrave Drive
Upper Marlboro, MD 20774

Dear Mr. Carter:

The purpose of this letter is to document our decision to suspend you for ten days based on your failure to cover your scheduled shift on Friday, November 19, 2004 without first providing advance notice to a manager of your intended absence, and to respond to your letter of December 9, 2004 to our Health Center. Given that you are currently out for medical reasons, the days of your suspension will be determined upon your schedule return. Please notify me directly when you have been cleared by your doctor to return.

In my October 27, 2004 letter to you, I made it clear that, "If you cannot cover a scheduled shift, you must call a manager, foreman, or supervisor in advance of your shift—with as much notice as possible—to notify them that you will be absent and to explain the reason for the absence." Yet, on November 19, 2004, you failed to notify any Post manager that you did not intend to cover your shift that day. On November 19, 2004, at 1:30 p.m. we met with you to discuss your return to work, and the necessary conditions that you would be required to meet as part of your return. Additionally, you were scheduled to work the 2:30 p.m. afternoon shift following this meeting. In the middle of our conversation regarding your return to work, you notified us for the first time that you were not going to cover your shift that day because you scheduled a doctor's appointment that conflicted with your scheduled shift.

Your failure to cover your shift on November 19, 2004 without providing the required notice to the Post was unacceptable. Having been off-work for several weeks, you surely could have either scheduled a doctor's appointment on a day that you were not scheduled to work or notified your supervisors in advance of your intended absence. Instead, you did not notify anyone of your intended absence that day until mid-way through our return to work conversation with you at the beginning of the shift, thereby failing to comply with the clear expectation that we provided in our October 27, 2004 letter.

This is not the first time that you have been disciplined for your behavior or warned about your attendance. On August 29, 1997 you received a warning letter for an unacceptable record of reporting late for your shifts. On June 1, 2001 you received a three-day disciplinary suspension for insubordination and leaving work without permission. And on October 27, 2004 you received a five-day suspension for further insubordination and leaving work without permission.

In my previous letter to you I outlined the need for meeting attendance and performance standards, and I expressly warned you that "if you are again absent or late without being excused, you face a lengthy suspension, if not termination." You are expected to work all your shifts and perform your job at a level that is acceptable to your supervisors. Anything less is not acceptable and will not be tolerated. You have now earned three separate suspensions for your failure to meet our attendance and performance standards. This is a final warning that any

Mr. Jerome Carter
December 2, 2004
Page 2

further problems with your attendance, job performance, or behavior will result in the termination of your employment.

The second purpose of this letter is to respond to your December 9, 2004 letter to our Health Center Nurse Supervisor, Ann Griffin. In that letter, you refused to pursue the anger management course and EAP therapy we previously required of you as a condition of your return to work, until you were provided a copy of Dr. Restak's letter detailing the results of his return to work evaluation of you. In response to your concern, we will allow you to read Dr. Restak's letter while in my office. Please let me know when you would like to come in and review the letter and we will make it available to you.

Finally, as we explained to you in our November 19, 2004 meeting, you must comply with the following three conditions in order to return to work:

- Enroll in an anger management program and complete all sessions. You must also sign a release so that Ann Griffin may consult with the counselor regarding your progress.
- Contact EAP to schedule counseling sessions and sign a release so that Ann Griffin may consult with the counselor regarding your progress.
- Conform your workplace behavior and attendance to the General Worker Department standards.

Successful completion of the EAP counseling and anger management sessions is necessary for your continued employment, and failure to enroll in and complete these programs will be considered insubordination. There is no reason why you cannot begin these sessions immediately. We expect to see you begin both your anger management and EAP sessions by January 15, 2004.

Over the course of the last few months, we have had a number of discussions with you regarding your attendance and work performance. Please be aware that any further violations of our attendance or work performance expectations will result in the termination of your employment. Similarly, the steps outlined above for your return to work are mandatory, and failure to complete these steps will also result in the termination of your employment.

Sincerely,

Melinda Ford
Pressroom Superintendent

cc:    Jim Coley
       Jeremy Rymarceuk
       Kevin O'Neill
       Jan Doll
       Rod Griggs
       Greg Estep
       Trish Dunn
       Jay B. Kennedy
       Personnel Records
       Chapel Chairman
       GCIU Local 449

**The Washington Post**
SPRINGFIELD PLANT

# EXHIBIT 9

December 28, 2004

<u>**SENT BY FEDERAL EXPRESS AND BY FAX**</u>

Ms. Melinda Ford, Pressroom Superintendent
The Washington Post - Springfield Plant
7171 Wimsatt Road
Springfield, VA 22151

Dear Ms. Ford:

The purpose of this letter is to respond to your letter dated December 22, 2004 concerning the decision to suspend me for ten days based on your statement in your letter "your failure to cover scheduled shift on Friday, November 19 without first providing advanced notice to a manager of your intended absence" It is my hope that this decision can be reevaluated and rescinded. To preface in October before my suspension began, I was advised by my shift supervisor I could not return to work until I spoke to you and would not be allowed back to work until it was sanctioned by management, you. Since then I have only been communicating with you or Ann Griffin the Health Center Supervisor as instructed so I believe that the conversations and documentation I provided was to you and the Health Center and my communication with my manager or supervisor was ceased early on.

I spoken to you on Wednesday, November 17th after checking my answering machine and receiving you message asking me to come in to meet with you to discuss the Dr's report and your conditions for my being able to return to work. During my return call on that Wednesday, November 17th - I first specifically asked if you had Dr. Restak's report and if you could mail me a copy I also explained that I had a family emergency and that I was calling you from a hospital in Newport News where I had been for the past two days at my mothers bedside who was seriously ill. I explained to you that it was impossible for me to met with you on Wednesday, November 17th as I was out of town but that I had a previously scheduled doctors appointed for that Friday and planned on coming back to go to it so we could met then. You advised me then on the that phone call that I must have documentation to prove my whereabouts and to verify why I could not come in and my Dr's appointment when I came in to meet. At the beginning of our meeting on Friday, November 19, I provided you with the documentation from the hospital and my doctors appointment for that afternoon which I could not make because I was told during the meeting that I could not leave until our meeting was over. I also asked at the beginning of the meeting if I could have a copy of Dr. Restak's report to look at and for myself.

Because my communications were now only with management, I truly understood my predicament was being handled by you as Pressroom Superintendent and Ann Griffin as the Health Center Supervisor so that is who I gave notification as I was advised to do from the beginning. I was not aware that I needed to notify my department manager or supervisor. I sincerely believed that they were being notified by management of when I would able to return to work.

1

Ms. Melinda Ford
December 28, 2004
Page 2

In fact at the meeting on November 19, I spoke about that fact that I would need more time off at that meeting because of the situation with my mom might in fact come to a hospice situation and I would need family leave and I was instructed by Ann Griffin to get the forms from the Benefits department. There was no understanding about me starting work that day or any day at that point. I know its not necessary to include this information but my mom passed away during the holidays.

From November 17 and up until December 22 there was no indication from you that I had not covered that any shift including the November 19th shift. I have received no communication indicating I would be suspended for no coverage of a shift until I put in writing to the Health Center by fax on December 9, 2004 a request for a copy of Dr. Restak's report which I was denied during our meeting. I am also wondering if when I contacted the Benefits Department to check my leave status a week before Christmas to find out why I was not being paid anymore. The benefits department said my status was unchanged since October after my five day suspension and would inquire with the Health Department why I was not still being paid before I could apply for any insurance benefits. Now I am being suspended six weeks later and now told I can make an appointment to see Dr. Restak's report. I am dumbfounded, surprised and saddened because I want all of this to end and have wanted to return to work after my five day suspension but at that time I was forced to not return and see Dr. Restak or face losing my job.

In your second paragraph you state "Additionally, you were scheduled to work the 2:30 p.m. afternoon shift following this meeting," however during the meeting I was told that I could not return to work unless I accepted your conditions for my return. The conditions for my return were that I would have to go to anger management and EAP counseling as result of Dr. Restak's report. At that beginning of the meeting I ask for a copy of the report before we entered into any discussions of the conditions for return to work and once the conditions for return to work were given to me I insisted on a copy. I asked Ann Griffin who is the person in charge of my medical records and the Health Center Supervisor personally in this meeting and was advised by Jennie not Ms.Griffin that I was not entitled to a copy or to even see the report. Ms. Griffin responded that she did not receive a report from the Dr. I also contacted Dr. Restak's office before and after our meeting and was advised that a copy of the doctors report could be obtain from my health department.

On November 19, I was basically threaten once again to accept the terms of return to work or face losing my job. In that meeting I felt as if I were once again being railroaded because the only reason for my going to the doctor was the threat of losing my job. I do not know if I could have refused to go without losing my job. I considered the treatment totally unfair and wondered if my rights were being violated.

At this meeting, I was in total confusion and shock being unable to accept all of this. I expressed that my conversation with Dr. Restak after his testing and questions concerning my conflicts did

2

Ms. Melinda Ford
December 28, 2004
Page 3

not lead me to believe this was his evaluation. I explain why my conversation with him and the
Post's actions seem confusingly different from my talk with Dr. Restak. Dr. Restak said to me
based on my answers to his question and my passing his testing that there was nothing he could
see wrong with me and that from his understanding of the conflicts after listening to me he
suggested that I was working in a "hostile work environment."

After I keep insisting on seeing and getting a copy of his report and that it was unfair that all of
you know what it says and I do not, you stated that you did not have a report to supply me with
but that day but had spoken to the Dr. on the phone. You also stated because I had come to you
on several occasions expressing my frustration with my superiors and what I was experiencing at
work you/the Post have made the decision that I go to anger management and EAP counseling. I
think that a more concerted effort should be made to get to the source of the problem that stems
from 2001 and have not only me but the foreman and now supervisors who have injected
themselves into these issues to score brownie points with the foreman. Including myself to come
together with a professional counselor to resolve the issues. Because it's a fact that coworkers are
told not to talk or even socialize with me and with some have been told by my superiors that they
have issues with me. Why am I being singled out, the very fact that I have come to you on many
occasions means that I have been trying to avoid what lead up to my being suspended for five
days on October 27 and then forced to see a Dr. to evaluate my "state." You all know my
concerns and I truly believe they can be remedied if there is concern for your workers in the
workplace.

I would also like to respond to your assertion that in my December 9 letter I "refused to pursue
the anger management course and EAP therapy." I never wrote that in my actually memo or
addressed the conditions for my return to work. I did request a copy of Dr. Restak's report and
continued to preface the fact that I was told from the beginning of my forced medical leave by
you, Ann Griffin and even Dr. Restak that I would be on "paid medical evaluation leave" until I
received a copy from Dr. Restak concerning his findings. On November 19, there was no Drs.
Report so therefore there was no need for the meeting. I do not know why then I was then not
paid anymore because the terms of my being out of work included paid leave until Dr. Restak's
findings were provided, until this day I have not seen anything.

Finally, I would like to address the mandatory conditions for my return to work. I request again
that I received in the mail from the Health Center a copy of Dr. Restak's report before we can
move forward. I would like to receive this by January 4th and do not think it is necessary for me
to make an appointment to view an evaluation of my "state" I think this is my right. If you can
not have Ann Griffin , the Health Center Supervisor provide me with a copy of the report, please
send me by January 4th a written notice of policy or employment law which states I am not
entitled to records from Dr. Restak in my medical file or personnel file or wherever it is being

3

Ms. Melinda Ford
December 28, 2004
Page 4

filed. I am requesting in writing formally that I received on or the other (Dr. Restak's report or and explanation for withholding the report from me) on January 4th so I can make can make a informed decision that effects me.

Sincerely,

Jerome W. Carter

Enclosure:    Memo of December 9 to Ann Griffin

Cc:    Ann Griffin
       Jim Coley
       Jenny Rymancsuk
       Kevin O'Neill
       Jan Doll
       Rod Griggs
       Greg Estep
       Trish Dunn
       Jay B. Kennedy
       Personnel Records
       Chapel Chairman
       GCIU Local 449

4