UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JEROME CARTER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THE WASHINGTON POST, )<br>)<br>Defendant. )<br>) | Civil Action No. 05-1712 (RMC) |

**MEMORANDUM OPINION**

Jerome Carter is an African American who worked as a pressroom general worker for The Washington Post ("the Post") from June 28, 1989 to January 27, 2005, when he was terminated for insubordination and failure to comply with the Post's attendance policies. He has filed suit alleging violations of the Family Medical Leave Act of 1993 ("FMLA"), Pub. L. 103-3, 107 Stat. 6; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. The Post moves to dismiss Mr. Carter's Title VII and ADA claims. Finding that Mr. Carter never filed a charge of discrimination under Title VII with the D.C. Office of Human Rights ("OHR") or the Equal Employment Opportunity Commission ("EEOC"), the Court concludes that it has no jurisdiction over his claims of race discrimination. Further, because Mr. Carter never filed a charge alleging that the Post failed to accommodate his disability, the Court is without jurisdiction over his ADA claim, as presented in the Amended Complaint. These two counts will be dismissed.

## I. BACKGROUND

As a general worker in the pressroom, Mr. Carter's duties involved keeping the pressroom clean, keeping the presses and machinery clean, and handling the newspaper waste by moving unmechanized waste carts. Am. Compl. ¶ 19.[1] His direct supervisor was Bruce Wilson, his second line supervisor was Bernard Mornot, and his third line supervisor was Melinda Ford, the pressroom superintendent.

The relevant events began on or about October 29, 2000, when Mr. Mornot – Mr. Carter's then-first line supervisor – screamed and cursed at Mr. Carter for going to the payroll office to verify the time for "compassion leave" to which Mr. Carter was entitled as a result of his brother's death. Mr. Mornot appears to have taken umbrage at Mr. Carter's challenge to Mr. Mornot's calculation of his compassion leave. It did not help that Mr. Mornot was allegedly intoxicated by alcohol at the time. Mr. Mornot emphasized his displeasure by physically pushing and shoving Mr. Carter. This incident caused embarrassment to Mr. Carter, who had several meetings with people from the Post's Human Resources ("HR") office to complain about it and to demand an apology. At a meeting on March 27, 2001, Mr. Mornot admitted his conduct and offered a verbal apology.[2] This was not satisfactory to Mr. Carter, who wanted a written apology that could be placed in Mr. Carter's personnel file. Mr. Carter followed up the March 27 meeting with a letter demanding

---

[1] The facts are taken from the Amended Complaint and are assumed to be true for purposes of ruling on the Post's motion to dismiss. *Lopez v. United States*, 309 F. Supp. 2d 22, 26 (D.D.C. 2004).

[2] Am. Compl., Ex. 3 (March 28, 2001, Letter from Mr. Carter to J. Coley). Consideration of documents attached to Mr. Carter's complaint is appropriate without converting the motion to dismiss to one for summary judgment. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997), *remanded to* 20 F. Supp. 2d 66 (D.D.C. 1998), *aff'd*, 254 F.3d 315 (D.C. Cir. 2000) (Table).

greater satisfaction.

The Post conducted a further investigation and met again with Mr. Carter on May 31, 2001. According to a June 7, 2001, letter from Pressroom Superintendent Eric Brinkman to Mr. Carter concerning this meeting, Mr. Carter became agitated upon learning that Mr. Mornot would not be required to take any further action. Mr. Carter walked out of the meeting and was followed by Mr. Brinkman, who told him he should return to the meeting to avoid discipline for insubordination involved with walking out on supervisors. Mr. Carter thought better of it, returned to the meeting, and it was concluded. Upset after the meeting, he asked to leave work early, but Mr. Brinkman denied the request because it was too late to obtain a replacement. Mr. Carter left work anyway and was suspended on June 1, 2, and 5, 2001.[3] Shortly thereafter, on June 7, 2001, Mr. Carter injured his shoulder and neck, pushing a heavy cart of newspaper waste.

On or about April 2004, Mr. Carter complained to Mr. Mornot about Mr. Wilson and another coworker regularly leaving before the end of the shift. On or about October 15, 2004, Mr. Wilson assigned an inordinate amount of work to Mr. Carter to cover for an idle co-worker.

From June through August 2004, Mr. Carter met with Ms. Ford and other management personnel on several instances "regarding the hostile work environment and [his] work schedule." Am. Compl. ¶ 26. "This extra-heavy workload aggravated [Mr. Carter's] existing shoulder condition." *Id.* ¶ 27. When Mr. Carter asked to leave work early due to his shoulder, Mr.

---

[3] Much later, Mr. Carter authored a memorandum disputing Mr. Brinkman's summary of the events of June 7, 2001, and the reasons for the three-day suspension. *See* Am. Compl., Ex. 3 (March 26, 2002, Letter from Mr. Carter to Patricia Dunn) ("The sole reason I was suspended was I refused to be a part of another meeting without Union representation or Union involvement."). The Court does not need to address this difference of recollection and notes that it does not concern either Mr. Carter's race or his alleged disability.

Wilson denied his request. *Id.* Mr. Carter left work early despite Mr. Wilson's denial of his request and was suspended from work as a result. *Id.* ¶ 28.

On or about October 18, 2004, as conditions for his return to work, the Post placed Mr. Carter on medical leave and required him to see their psychiatrist, Dr. Richard Restak, for a medical and psychiatric evaluation. *Id.* ¶ 29. Dr. Restak recommended that Mr. Carter be required to enroll in anger management classes before returning to work. Am. Compl., Ex. 11 (Nov. 10, 2004, Letter from Dr. Restak to Ms. Ann Griffin, Health Center Supervisor at the Post). Mr. Carter met with management representatives on November 19, 2004, at 1:30 p.m. Mr. Carter was scheduled to return to work on a shift beginning at 2:30 p.m. Mr. Carter did not report to work because he had a doctor's appointment with Dr. Sharon Schieth regarding his shoulder and neck problems. Mr. Carter did not follow normal policy and inform his supervisor that he would not be at work; as a result, he was suspended for ten days. In response, he wrote a letter to Ms. Ford, Pressroom Superintendent, explaining,

> Because my communications were now only with management, I truly understood my predicament was being handled by you as Pressroom Superintendent and Ann Griffin as the Health Center Supervisor so that is who I gave notification as I was advised to do from the beginning. I was not aware that I needed to notify my department manager or supervisor. I sincerely believed that they were being notified by management of when I would be able to return to work.

Am. Compl., Ex. 9 (Dec. 28, 2004, Letter from Mr. Carter to Ms. Ford). This explanation was insufficient to cause the Post to rescind the 10-day suspension.

Mr. Carter was scheduled to return to work on January 22, 2005, but on that date he provided a note from his doctor indicating that he could not work for another week for "confidential" reasons. Am. Compl., Ex. 10 (January 26, 2005, Letter to Mr. Carter from Ms. Ford). This reason

being unacceptable to the Post, Ms. Ford called Mr Carter and told him that he needed to provide a release to the Post so that his employer could verify the medical reasons for his absence. Mr. Carter refused to do so and angrily hung up the telephone during the conversation. *Id.* Consequently, on January 26, 2005, Ms. Ford issued a termination letter to Mr. Carter "for a continued pattern of insubordinate conduct, for continued violation of [the Post's] attendance policies, and for failing to cooperate in [the Post's] investigation into [Mr. Carter's] absences." *Id.*

Mr. Carter filed a charge with the EEOC on May 18, 2005. He charged the Post with discrimination on account of disability. In full, his charge alleged:

> I began to work for the Washington Post in 1989. In November 2004, I presented a doctor's notice letting my employer know that I needed leave for my disability and requested leave from November 22, 2004, through January 22, 2005. On January 25, 2005, the pressroom Superintendent called me at home to request a release for sensitive medical information. During this conversation, I let her know that I could not provide this release outright and that other procedures needed to be followed per the Washington's Post's own policy. On January 26, 2005, I was terminated.
>
> I believe that I was terminated because of my disability in violation of the Americans Disabilities Act [sic] of 1990, as amended.

Defendant's Memorandum in Support of Motion to Dismiss ("Def.'s Mem."), Ex. 1.[4] Mr. Carter only checked the box for "disability" as the basis for his charge and did not check the boxes to allege discrimination based on race, color, sex, religion, national origin, retaliation, age, or other. *Id.* The

---

[4] Although Mr. Carter did not attach his EEOC charge to his complaint, he referenced it in paragraph 12 of the complaint. In ruling on a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), the court may consider documents "attached to or incorporated in the complaint." *St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *see also Darby v. S.B. Ballard Constr. Co.*, Civ. Action 05-199, 2005 WL 2077299 at *1 & n.1 (M.D. Fla. Aug. 26, 2005) (noting that the court could consider the EEOC charge because it was referenced in the complaint).

EEOC mailed a notice of right to sue to Mr. Carter on May 27, 2005. *Id.* He filed suit on August 26, 2005.[5]

## II.  LEGAL STANDARDS

### A. Jurisdiction

Federal district courts have original jurisdiction over civil actions arising under federal statutes. 28 U.S.C. § 1331. Here, Plaintiff brought suit under the Family Medical Leave Act, Pub. L. 103-3, 107 Stat. 6; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.; and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. As this case presents questions of federal law, this Court has original jurisdiction.

### B. Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(1), Mr. Carter bears the burden of proving by a preponderance of the evidence that the Court possesses jurisdiction over the subject matter of his claims. *See Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 195 (D.D.C. 2002). In reviewing a motion to dismiss under Rule 12(b)(1), the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. These allegations, however, "'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE 2D, § 1350). The Court may consider information outside of the

---

[5] The initial complaint stated that Mr. Carter received his notice of right to sue on May 27, 2005, not that it was mailed by the EEOC on that date. One of the bases for the Post's motion to dismiss is that the complaint was not timely filed. The complaint was filed on August 26, 2005, which was 91 days after May 27. It now being clear that May 27, 2005, was the mailing date and not the receipt date of the notice of right to sue, the Court finds the complaint timely.

pleadings to determine its jurisdiction. *Lipsman v. Sec'y of Army*, 257 F. Supp. 2d 3, 6 (D.D.C. 2003).

### III. ANALYSIS

#### A. Title VII Allegations

Without doubt, an employee must file a charge with the EEOC or a State human rights agency prior to, and as a mandatory prerequisite to, any lawsuit. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (noting that "Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge"); *see also Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) ("Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a change to act on it."). Any lawsuit alleging a violation of Title VII "is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Park*, 71 F.3d at 907 (citation omitted). When no charge is filed, no lawsuit may be pursued.

In the instant case, the Amended Complaint alleges that Mr. Carter was required to undergo physical and mental evaluations against his will, and was later denied a copy of any report arising therefrom, because he is "an African American, race, and color black, and Defendant failed to remedy the hostile work environment, and instead, retaliated" against him by firing him. Am. Compl. ¶¶ 44, 47. However, Mr. Carter filed a charge with the EEOC alleging disability discrimination. He charged that the Post discriminated against him on the basis of an unidentified disability by requesting that he provide a release of medical information, allegedly in contradiction to the newspaper's policies. Def.'s Mem., Ex. 1. He did not check any box to indicate that he also

charged the Post with race discrimination, discrimination based on his color, discrimination based on a hostile work environment, or retaliation for protected activity.  Nothing in the text of his charge hinted that he also intended to charge the Post with race or color discrimination or hostile work environment or retaliation.  Without some indication in his EEOC charge that he alleged discrimination on the basis of race or color or hostile work environment or retaliation in violation of Title VII, he cannot proceed here on such claims.  *Brown v. D.C.*, 251 F. Supp. 2d 152, 162 (D.D.C. 2003) (holding that plaintiff failed to exhaust administrative remedies on gender discrimination and retaliation allegations where she had "checked only the boxes for allegations of discrimination based on race and disability, and did not check the boxes for gender discrimination or retaliation" or otherwise indicate such allegations); *see also Hunt v. D.C. Dep't of Corrections*, 41 F. Supp. 2d 31, 36 (D.D.C. 1999) (holding that plaintiff failed to exhaust her administrative remedies when she "specifically checked the boxes for age discrimination and retaliation, but she did not check the box for gender discrimination" or otherwise indicate that "she was alleging gender discrimination"); *Sisay v. Greyhound Lines, Inc.*, 34 F. Supp. 2d 59, 64 (D.D.C. 1998) (finding a failure to exhaust administrative remedies where plaintiff "alleged only race discrimination and retaliation in his EEOC charge.  Absent from that complaint is any indication of a claim of national origin discrimination either in the form of express words or factual allegations that would support such a claim").

       The law does not hold an employee to use of magic words to make out a proper form of discrimination charge.  However, he must alert the EEOC and the charged employer with the nature of the alleged wrongdoing.  The EEOC charge form makes this extremely easy, with its boxes that an employee can merely check.  If an employee is uncertain of the cause of discrimination that

he believes has occurred, he need only describe it in the text of the charge form. As to his race, color, hostile work environment, and retaliation claims, Mr. Carter neither checked the appropriate box nor described his claims in the charge form. His charge form is direct and to the point: he alleged discrimination only based on his unidentified disability. He has therefore failed to exhaust his administrative remedies on his claims arising under Title VII and these allegations must be dismissed because the Court has no jurisdiction over them.

### B. ADA Allegations

Count II of the Amended Complaint alleges that "[n]otwithstanding Plaintiff's confirmed disability/illness," the Post required him to return to work, denied his repeated requests for accommodation such as light duty, and failed to accommodate his condition by assigning him to a position involving less strenuous physical labor. Am. Compl. ¶¶ 56-58. The Post asserts that Mr. Carter failed to exhaust his administrative remedies as to these claims as well.[6]

In his Amended Complaint, Mr. Carter does not allege that he was discharged based on disability discrimination – Count II only alleges that the Post failed to accommodate his disability. However, on his EEOC charge form, which has been quoted in full above, Mr. Carter checked the box for disability discrimination, described Ms. Ford's telephone call to him to request a medical release and his refusal to give one, his subsequent termination, and his belief "that I was terminated because of my disability." Def.'s Mem., Ex. 1. The charge said nothing about his requests for light duty or any other accommodation and also said nothing about the Post's alleged refusal to make a

---

[6] According to the Amended Complaint, Mr. Carter "timely filed a discrimination, hostile work environment, and retaliatory action claim with the [EEOC]." *Id.* ¶ 12. The Court has found already that Mr. Carter's EEOC charge did not make out charges for discrimination, hostile work environment, and retaliation in violation of Title VII as a matter of law, despite this factual averment in the Amended Complaint.

reasonable accommodation for him.

The sole basis for Mr. Carter's EEOC charge was the fact that he refused to provide a medical release upon request, in alleged violation of the Post's own policies. These facts did not give notice that Mr. Carter's complaint was also that the Post failed to accommodate his disability, and the EEOC had no reason to investigate and consider whether the Post so failed in its legal duties. Yet the purpose of a charge to the EEOC, under the ADA as much as Title VII, is to "giv[e] that agency a chance to act on it." *Marshall*, 130 F.3d at 1098 (holding that plaintiff did not exhaust her administrative remedies with respect to her failure to accommodate claim where her charge merely asserted that she was denied a position because of her disability and made "no mention of any refusal to accommodate her lifting limitations"). Mr. Carter charged that the disability discrimination against him began on January 26, 2005 – the date of his termination – and ended on January 26, 2005. He did not charge any discrimination that might have occurred prior to January 26, 2005, and thus failed to notify the EEOC or the Post that he was complaining of earlier discrimination in the Post's alleged failure to accommodate his disability after he requested accommodation. *See Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 132 (D.D.C. 2003) (holding that plaintiff's failure to accommodate claim was not properly exhausted where the earliest and latest date of the alleged discrimination was the date of her termination and did not include the dates on which she was allegedly denied reasonable accommodations). The Court agrees with the Post that Mr. Carter failed to exhaust his administrative remedies as to the ADA failure-to-accommodate violations alleged in his Amended Complaint and will dismiss Count II for this reason.

The Court finds that it is without jurisdiction over Mr. Carter's failure-to-accommodate claim under the ADA because he failed to exhaust his administrative remedies prior

reasonable accommodation for him.

The sole basis for Mr. Carter's EEOC charge was the fact that he refused to provide a medical release upon request, in alleged violation of the Post's own policies. These facts did not give notice that Mr. Carter's complaint was also that the Post failed to accommodate his disability, and the EEOC had no reason to investigate and consider whether the Post so failed in its legal duties. Yet the purpose of a charge to the EEOC, under the ADA as much as Title VII, is to "giv[e] that agency a chance to act on it." *Marshall*, 130 F.3d at 1098 (holding that plaintiff did not exhaust her administrative remedies with respect to her failure to accommodate claim where her charge merely asserted that she was denied a position because of her disability and made "no mention of any refusal to accommodate her lifting limitations"). Mr. Carter charged that the disability discrimination against him began on January 26, 2005 – the date of his termination – and ended on January 26, 2005. He did not charge any discrimination that might have occurred prior to January 26, 2005, and thus failed to notify the EEOC or the Post that he was complaining of earlier discrimination in the Post's alleged failure to accommodate his disability after he requested accommodation. *See Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 132 (D.D.C. 2003) (holding that plaintiff's failure to accommodate claim was not properly exhausted where the earliest and latest date of the alleged discrimination was the date of her termination and did not include the dates on which she was allegedly denied reasonable accommodations). The Court agrees with the Post that Mr. Carter failed to exhaust his administrative remedies as to the ADA failure-to-accommodate violations alleged in his Amended Complaint and will dismiss Count II for this reason.

The Court finds that it is without jurisdiction over Mr. Carter's failure-to-accommodate claim under the ADA because he failed to exhaust his administrative remedies prior

to filing suit. For this reason, Count II of the Amended Complaint will be dismissed.

## IV. CONCLUSION

Counts I and II of the Amended Complaint will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). The Court has no jurisdiction over these Counts because Mr. Carter failed to exhaust his administrative remedies prior to filing suit. The Post's motion to dismiss Counts I and II will be granted. A separate order accompanies this memorandum opinion.

Date: May 15, 2006                                                /s/
                                                          ROSEMARY M. COLLYER
                                                          United States District Judge